**UNITED STATES v. PAN–AMERICAN PE-
TROLEUM CO.**

No. 6591.

Circuit Court of Appeals, Ninth Circuit.

Feb. 5, 1932.

Rehearing Denied March 14, 1932.

See, also, 24 F.(2d) 206.

Atlee Pomerene, Thomas M. Kirby, and Frank Harrison, Sp. Assts. to the Atty. Gen., Samuel W. McNabb, U. S. Atty., and Ignatius F. Parker, Asst. U. S. Atty., both of Los Angeles, Cal.

T. T. C. Gregory, of San Francisco, Cal., and Norman S. Sterry and Gibson, Dunn & Crutcher, all of Los Angeles, Cal., for appellee.

Before SAWTELLE, Circuit Judge, and NETERER and ST. SURE, District Judges.

SAWTELLE, Circuit Judge.

This case comes to us from the United States District Court for the Southern District of California, Central Division. It involves the validity of three certain oil leases in sections 1 and 2, township 31 south, range 24 east, Kern county, Cal., south of three offset strip leases across the northerly portion of the two sections. The first of the leases, the Visalia 010042 lease, hereinafter known as

the E lease, covers 421 acres in section 1, and was issued to the defendant on December 14, 1921; the second, the Visalia 010043 lease, hereinafter known as the I lease, covers 63.2 acres in section 1, and was issued on December 14, 1921, to W. R. Ramsey, who subsequently assigned it to the defendant; the third, the Visalia 010097 lease, hereinafter referred to as the G lease, covers 176.78 acres in section 2, and was issued to defendant on February 8, 1922. This third lease has also been referred to as the lease given in compromise of the placer mining claim of White and Coffin for fuller's earth.

The prior case of United States v. Pan-American Petroleum & Transport Co., hereinafter referred to as the first Pan-American Case, has been reported in the opinions of the District Court, 6 F.(2d) 43–89, of the Circuit Court of Appeals for the Ninth Circuit, 9 F.(2d) 761-773, and of the Supreme Court, 273 U. S. 456-510, 47 S. Ct. 416, 422, 71 L. Ed. 734. The records in the first case give an exhaustive statement of the history and facts of that case, all of which records, by stipulation of counsel, are made as much a part of this case as if they were fully herein set forth. The stipulation provided that the records in the first case be admitted here for the purposes of proving: (1) what was litigated in that case; (2) the truth of the averments of the amended bill of complaint in the instant case and, indeed, "for all purposes." For that reason, we will, therefore, endeavor to confine our statement to the facts proved in the instant case, referring to the evidence adduced in the first case only when necessary to a proper understanding of the issues here involved. The cases of United States v. Belridge Oil Co. (C. C. A.) 13 F. (2d) 562, and Mammoth Oil Co. v. United States, 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. 137, also furnish collateral facts which will be referred to.

This suit was commenced on September 2, 1924, by the Attorney General at the request of Curtis D. Wilbur, now a member of this court, then Secretary of the Navy, and Hubert Work, then Secretary of the Interior. It was pending about two months before the trial of the first Pan-American Case. On July 12, 1926, the court below, by consent of counsel, ordered this case continued for the term pending disposition of the former suit which was then on appeal. Trial of the instant suit commenced December 2, 1929, and was decided by the court below on November 10, 1930. The bill is based upon allegations of (1) fraud tainting all the leas-

es; (2) fraudulent conspiracy to secure the leases; (3) illegality in the terms of the leases, and illegality and lack of authority in the purposes and the making of them.

The particular land here involved is located in what is known as Naval Petroleum Reserve No. 1, which comprises some 37,000 acres of land in all. Between 4,400 and 5,900 acres within the reserve are held in fee, mostly by the Standard Oil Company of California, hereinafter referred to as Standard Oil, leaving about 32,000 acres owned by the government. These lands were a part of the unappropriated public domain of the United States, and as such they were, under the Act of February 11, 1897 (30 USCA § 101), subject to entry for oil under laws relating to placer mineral claims. They were also, under the Act of July 9, 1870 (30 USCA § 35), subject to entry for fuller's earth under the provisions of laws relating to placer mineral claims. On September 27, 1909, the Secretary of the Interior issued an order withdrawing from entry a large number of acres of supposedly oil lands "in aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain. * * * All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination."

The lands here involved were covered by that withdrawal order.

On June 25, 1910, Congress passed an act expressly giving the President power to withdraw from entry lands for "public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." 43 USCA § 141.

This act further protected the rights of any locator who, at the date of any order of withdrawal, was a bona fide occupant or claimant of oil lands, and who, at such date, was in diligent prosecution of work leading to the discovery of oil, so long as such locator continued in diligent prosecution of work. 43 USCA § 142. Following the above act, the President, on July 2, 1910, confirmed a number of withdrawal orders made theretofore covering a large number of acres, including the lands here considered. On September 2, 1912, President Taft created Naval Petroleum Reserve No. 1 "for the exclusive use or benefit of the United States Navy until this order is revoked by the President or by Act of Congress." By similar orders in 1912 and 1915 Naval Petroleum Reserves Nos. 2 and 3 were created.

By the General Leasing Act of February 25, 1920 (30 USCA § 181 et seq.), Congress attempted to fix a general policy for the handling of placer mining claims, excluding lands withdrawn or reserved for naval purposes except as therein otherwise expressly provided. Section 17 thereof (30 USCA § 226) provides for leasing, pursuant to competitive bidding, unappropriated deposits of oil in the known geological structure of a producing field, with a royalty fixed in the lease not less than 12½ per cent., and also that: "Whenever the average daily production of any oil well shall not exceed ten (10) barrels per day, the Secretary of the Interior is authorized to reduce the royalty on future production when in his judgment the wells cannot be successfully operated upon the royalty fixed in the lease. The provisions of this section shall apply to all oil and gas leases made under this subchapter."

Section 18 of the same act provides:

"Upon relinquishment to the United States, filed in the General Land Office within six months after February 25, 1920, of all right, title, and interest claimed and possessed prior to July 3, 1910, and continuously since by the claimant or his predecessor in interest under the preexisting placer mining law to any oil or gas bearing land upon which there has been drilled one or more oil or gas wells to discovery embraced in the Executive order of withdrawal issued September 27, 1909, and not within any naval petroleum reserve, and upon payment as royalty to the United States of an amount equal to the value at the time of production of one-eighth of all the oil or gas already produced except oil or gas used for production purposes on the claim, or unavoidably lost, from such land, the claimant, or his successor, if in possession of such land, undisputed by any other claimant prior to July 1, 1919, shall be entitled to a lease thereon from the United States for a period of twenty years, at a royalty of not less than 12½ per centum of all the oil or gas produced except oil or gas used for production purposes on the claim, or unavoidably lost: * * *

"Provided, however, That as to all like claims situate within any naval petroleum reserve the producing wells thereon only shall be leased, together with an area of land sufficient for the operation thereof, upon the terms and payment of royalties for past and future production as herein provided for in the leasing of claims. No wells shall be drilled in the land subject to this provision within six hundred and sixty feet of any such

leased well without the consent of the lessee: Provided, however, That the President may, in his discretion, lease the remainder or any part of any such claim upon which such wells have been drilled, and in the event of such leasing said claimant or his successor shall have a preference right to such lease: And provided further, That he may permit the drilling of additional wells by the claimant or his successor within the limited area of six hundred and sixty feet theretofore provided for upon such terms and conditions as he may prescribe. * * *" 30 USCA § 227.

A section of temporary character, 18a (34 USCA § 524a note) dealt with the manner of settlement of claims: "That whenever the validity of any gas or petroleum placer claim under pre-existing law to land embraced in the executive order of withdrawal issued September 27, 1909, has been or may hereafter be drawn in question on behalf of the United States in any departmental or judicial proceedings, the President is hereby authorized at any time within twelve months after the approval of this Act to direct the compromise and settlement of any such controversy upon such terms and conditions as may be agreed upon, to be carried out by an exchange or division of land, or division of the proceeds of operation."

The terms of the act are elaborated by Regulations of the Department of the Interior in Circular No. 672 that refers to the above section 18 (30 USCA § 227) as a relief measure for claimants of oil and gas lands who had not perfected their claims under pre-existing mining laws and are prevented from doing so by withdrawal of the land or by the act. The conditions for relief are that the land remains withdrawn under the order of September 27, 1909; that the claim was initiated prior to July 3, 1910, and possessed continuously since; that claimant or predecessors must have drilled an oil or gas well on the land to discovery; and that claimant must have filed, on or before August 25, 1920, "a relinquishment to the United States of all rights, title and interest in and to the land, together with an application for a lease."

Royalties for oil are fixed in two brackets: The first, for oil of 30° Baumé or over, at 12½ per cent. up to 20 barrels per day per well; at 16⅔ per cent. up to 50 barrels per day per well; at 20 per cent. up to 100 barrels per day per well; and at 25 per cent. for more than 100 barrels per day per well; the second, for oil less than 30° Baumé, at 12½, 14⅔, 16⅔, and 20 per cent. in the above classifications.

By the regulations it was further provided that the following may not proceed to patent, notwithstanding absence of fraud and full compliance with law in other respects: "(b) Any location made before withdrawal of the land, but not perfected by discovery at date of withdrawal, which does not come within the protective provision of section 2 of the Act of June 25, 1910; that is to say, any claimant who at the date of withdrawal, was not a bona fide occupant or claimant in diligent prosecution of work leading to discovery of oil or gas, and who has not continued in such diligent prosecution to discovery."

It thus appears that, even after the passage of the General Leasing Act, no official in the executive department of the government had authority to deal with lands included in the naval petroleum reserves that were not subject to claims upon which there were producing wells or claims which should be compromised in accordance with section 18a, or valid claims for patent under pre-existing law.

On March 5, 1920, Secretary of the Navy Daniels wrote the chairman of the Naval Committee of the House of Representatives suggesting the need for additional legislation to protect naval petroleum reserve lands from drainage by the development of privately owned lands adjoining or within the boundaries of the reserves, and in accordance with his suggestions was passed the Act of June 4, 1920 (34 USCA § 524), providing: "The Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under the provisions of [the General Leasing Act] or pending applications for United States patent under any law; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States; and provided further, that the rights of any claimant under said [General Leasing Act] are not affected adversely thereby."

It was after the passage of the above act that Albert B. Fall became Secretary of the Interior on March 5, 1921.

The first Pan-American Case showed the facts leading up to the presidential order of

May 31, 1921, which transferred the duty of administering the naval petroleum reserves from the Secretary of the Navy to the Secretary of the Interior, but we deem it important to quote the order in toto: "Under the provisions of the Act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any Naval Petroleum Reserve; authorizing the President to permit the drilling of additional wells or to lease the remainder of any part of a claim upon which such wells have been drilled; and under authority of the Act of Congress approved June 4, 1920 (41 Stat. 912), directing the Secretary of the Navy to conserve, develop, use and operate, directly or by contract, lease, or otherwise, unappropriated lands in Naval Reserves, the administration, and conservation, of all oil and gas bearing lands in naval petroleum reserves Nos. 1 and 2, California, and naval petroleum reserve No. 3, in Wyoming, and naval shale reserves in Colorado and Utah, are hereby committed to the Secretary of the Interior subject to the supervision of the President, but no general policy as to drilling or reserving lands located in a naval reserve, shall be changed or adopted except upon consultation and co-operation with the Secretary or Acting Secretary of the Navy. The Secretary of the Interior is authorized and directed to perform any and all acts necessary for the protection, conservation and administration of said Reserves subject to the conditions and limitations contained in this order and of the existing laws or such laws as may hereafter be enacted by Congress pertaining thereto."

In construing this order and other acts, the Supreme Court said, in the first Pan-American Case, supra, that all of these "show that it has been and is the policy of the United States to maintain a great naval petroleum reserve in the ground."

After the passage of the Act of June 4, 1920 (41 Stat. 813), Secretary Daniels had resisted suggestions of drilling within the reserve, until finally, shortly prior to his retirement, he called for bids for the drilling of 22 offset wells along the north side of section 1 to protect the naval reserve against intensive drilling by Standard Oil on section 36. The bids were not received until after Mr. Fall became Secretary of the Interior and the promulgation of the executive order transferring the administration of the naval petroleum reserves from the Navy Department to the Department of the Interior. When they were received by the Navy Department, they were transmitted to the Interior Department on June 2, 1921, and Secretary Fall accepted defendant's bid of 55½ per cent. royalty as best. At that time the defendant, Pan-American Petroleum Company, hereinafter called Pan-American, was a wholly owned subsidiary of the Pan-American Petroleum & Transport Company, hereinafter called the transport company, and E. L. Doheny was in complete control and domination of both companies.

However, at the time of the calling for and accepting of the bid, there was pending in the Interior Department an application by the United Midway Oil Land Company, hereinafter referred to as United Midway, for a lease to certain lands within the reserve, based upon its claim that prior to the creation of the reserve it had expended a large amount of money in attempting to develop oil on section 12, south of section 1, and also that it had a placer mining location on part of section 1 in the reserve itself. On November 4, 1920, the Secretary of the Navy expressed the opinion that the claimants were not entitled to relief under any of the provisions of the Oil Leasing Act, and on February 24, 1921, the Secretary of the Interior (John Barton Payne) expressed the same view, denying the petition. Secretary Fall proposed to settle the United Midway claim by giving it an area south of the 22-well strip, but met with the serious objections of Dr. W. C. Mendenhall, special adviser to Secretary Fall with regard to handling of the naval petroleum reserve, Admiral R. S. Griffin and Commander H. A. Stuart, who had charge of the naval petroleum reserves for the Secretary of the Navy, the three of whom insisted that, if United Midway had any equities, it should be given land outside the reserve. Some considerable feeling seems to have developed between Dr. Mendenhall and Commander Stuart, on the one side, and Secretary Fall on the other, and as a result Fall expressed to Assistant Secretary of the Interior Finney, hereinafter referred to as Judge Finney, his extreme displeasure at having Mendenhall as his adviser on oil matters, and he never thereafter consulted Mendenhall. Commander Stuart shortly afterward was relieved from duty in connection with the naval petroleum reserves, this work being taken over by Admiral John K. Robison, Chief of the Bureau of Engineering of the Navy, who was made representative of Secretary Denby in naval petroleum reserve matters. Later, Commander Stuart was transferred from Washington. All of these pertinent facts appeared in the first Pan-American Case, and were there accepted

by the courts as evidence of improper motive upon the part of Fall, with the statement by the Supreme Court, however, that "Robison's motives were not the same as Fall's." First case, supra, page 493, of 273 U. S., 47 S. Ct. 416.

After the insistence of Admiral Griffin and Commander Stuart that United Midway be given lands outside of the reserve, Fall wrote to President Harding that he had asked Doheny whether the latter would object to a portion of the 22-well strip being awarded to United Midway. Mr. Doheny consented, and thereupon two leases were made, the H lease (Visalia 09264) on July 8, 1921, of 52.70 acres to the United Midway for 8 wells, and the D lease (Visalia 010032) on July 12, 1921, of 92 acres, the remainder of the strip, for 14 wells, to the appellee. Each of these two leases was at 55½ per cent. straight royalty to the government, and contained a provision that such royalties "shall be subject to reduction whenever the average daily production of any well shall not exceed 10 barrels per day if or in the judgment of the lessor the wells cannot be successfully operated upon the royalty fixed herein." And a further provision that the number of wells should be fixed at 8 for the H lease and 14 for the D lease, "unless the lessor shall deem it necessary to have additional wells drilled for the purpose of protecting the property against drainage by wells on adjacent lands, in which event, upon notice thereof, the lessee agrees to drill such necessary offset wells."

Both the United Midway and the Pan-American felt that the land would be very valuable and highly productive, but, when the first well on the D lease was brought in on October 3, 1921, the initial daily production was only 291.77 barrels, and, when the first well was brought in on the H lease on October 24, 1921, the initial daily production was only 108 barrels, contrasted with the initial daily production of the Standard Oil Company of several thousand barrels per well in section 36.

W. R. Ramsey had succeeded to the interests of United Midway in the H lease on July 20, 1921, the assignment of the lease being approved by Judge Finney on August 8, 1921. Ramsey was associated with the Continental Asphalt & Petroleum Company, hereinafter referred to as Continental. The latter was apparently unable to carry on its part of the development work, in view of the disappointing results of the first wells, and through A. J. Pizzini, a director of Continental, went to Doheny's offices with the request that the Pan-American join with it in applying to the Department for a reduction in the royalty. After correspondence on the subject between the New York office of Pan-American and J. Crampton Anderson, general manager of Pan-American in California and brother-in-law of Doheny, the Pan-American agreed to join with the United Midway in an application for a reduced royalty. Joseph J. Cotter, at different times vice president and attorney for appellee's parent company, the transport company, and John W. Staggers, attorney for the United Midway, called upon Secretary Fall and Judge Finney with the request that, in view of the disappointing results of the first wells, royalties be reduced. Doheny was informed as to at least some of these negotiations.

During the parleys, it was suggested that additional lands within the section might be granted to the lessees at regulation royalties. Judge Finney told Cotter and Staggers to put their proposals in writing, and shortly thereafter he spoke to Fall concerning the matter, and it was suggested that increased acreage in lieu of reduced royalties might be granted. The testimony is hopelessly contradictory as to who made the suggestion.

As indicative of the futility of attempting to get order out of the evidentiary chaos as to this point, we quote the following extract from Judge Finney's testimony: "My recollection is that the suggestion that we couldn't reduce the royalty in section 1, but might give them additional land, was made by Secretary Fall. I have testified about this matter a good many times. My memory is growing worse as time progresses."

Following the statement of Judge Finney that written application for reduction be filed, the appellee on November 22, 1921, and Ramsey by Staggers on November 23, 1921, filed such application.

Some time between November 22, 1921, and December 1, 1921, Fall directed or authorized the leasing to the two companies of the balance of section 1 at regulation royalties, with the result that on December 14, 1921, the I lease was issued to Ramsey and the E lease to the Pan-American.

It was during these negotiations that Doheny paid to Fall the bribe of $100,000, the circumstances of which have been set forth at length in the first Pan-American Case, supra, in the criminal case of Fall v. United States (App. D. C.) 49 F.(2d) 506, and in the following finding of fact of the court below: "November 29, 1921, Fall called upon

Doheny, pursuant to an arrangement made late in October or early in November, 1921, for delivery of One Hundred Thousand Dollars ($100,000) for Fall's personal use. On November 30, 1921, Doheny had his son obtain the money by the use of a check of his son and sent it in currency by his son to Fall at Washington. A few weeks later Doheny reimbursed his son. No entry of the transaction was made upon any books of Doheny, the Transport Company, or the defendant. Bank records would not show receipt of money by Fall from Doheny. Fall gave Doheny, Jr., his demand note for the money, payable to Doheny and the son delivered the note to his father. A few weeks thereafter Doheny tore Fall's signature from the note. The purpose of the tearing was that it would be unenforcible in the hands of third parties. * * * Fall carried the currency to El Paso, Texas; used Ten Thousand Dollars ($10,-000) of it as a down payment on the purchase of a ranch and subsequently used a large portion of it for the purchase of cashiers' checks to apply on the purchase price of the ranch, and deposited the balance in several banks, completing his payments on account of the purchase of the ranch by checks drawn on such accounts. Up to at least October, 1924, nothing had been paid on the note to Doheny on account of either principal or interest."

Fall directed or authorized the execution of the E and I leases, not for the purpose of offsetting drainage, but for the immediate purpose of relieving against the high royalties under the H and D leases and for the ultimate purpose of assisting Doheny, his friend and coconspirator, and Doheny's joint adventurer, Ramsey.

This entire phase of the case is more fully treated hereafter in our discussion of fraud and illegality.

On March 10, 1922, Ramsey entered into a contract with the defendant for the sale and assignment of the H lease to the defendant for $450,000 in cash, and for the sale of the relief lease I for $300,000 cash. At that time all but one of the wells on the D lease had been completed, and it was known that production was not over 300 barrels a day. At that time only 5 of the 8 wells on the H lease had been completed, but production of them was known. No wells had been brought in on the E lease, and only 4 wells were in process of drilling. No wells had been brought in on the I lease, and only 2 wells were in process of drilling. The details of the sales agreement between Ramsey and the defendant were completed by March 25, 1922,

and the two leases were assigned on that date and the assignment approved by Judge Finney on April 7, 1922.

On August 9, 1924, Dr. Bain, Director of the Bureau of Mines, and Judge Finney each certified that the two leases of December 14, 1921, at issue here, were granted as relief leases pursuant to the direction of Fall, no mention being made of drainage as a motive for them.

On November 30, 1921, the day of the payment of $100,000 to Fall, the Bureau of Mines, pursuant to the directions of Fall, prepared an invitation for bids for offset leases in sections 6 and 25 in the center of the reserve, and for a double row of 9 wells, 18 in all, along the north side of section 2. These invitations were mailed on the 1st of December, 1921, to the principal oil companies on the Pacific Coast.

There is testimony that the lease on the north half of section 2 was to offset drilling by the Pacific Oil Company, first owned by the Southern Pacific Railroad and later by Standard Oil, on section 35 outside the reserve. The Pacific Oil Company had drilled a number of wells in section 35, and was preparing for the drilling of a line of wells across the southerly line of the section. There is also testimony that the government was faced with the necessity of offsetting that drilling as quickly as possible, but no convincing testimony that Fall was actuated by such considerations. A number of bids were received for the various leases and were tabulated on December 29, 1921. None of the bids for offset leases on sections 25 and 6 were satisfactory. Dr. Bain went to the Pacific Coast on December 28, 1921, and, while there, learned that a nondrilling agreement could be arranged with the Pacific Oil Company. Such a "definite arrangement" was actually made orally as to sections 35 and 2, and Fall was informed of it. On the strength of that "additional information," and because of the unsatisfactory nature of the bids, after Dr. Bain returned to Washington in January, 1922, he recommended that there be no leasing of the strips in sections 6 and 25. The bids for the offset leases on section 2 were, however, considered and the Bureau of Mines recommended that: "The Navy will probably receive more royalty oil from the reserve as a whole if the bids were not given to the Pan-American. * * * The Associated bid of 36 per cent flat will probably yield the Navy the most oil." Pan-American had bid 35 per cent., and Judge Finney finally recommended that bid as the

best. Fall indorsed across the report the word "Approved."

However, a lease to Pan-American could not be issued, for the reason that all of section 2 was covered by four applications for patent for mining claims on an alleged discovery of fuller's earth. On January 1, 1907, R. J. White and associates located upon section 2 a placer mining claim for oil, asphaltum, gypsum, and other minerals. By February 21, 1911, White had acquired the interests of all of his associates, and he filed an application for a patent to the section based upon the alleged discovery of fuller's earth. The General Land Office, through special agents, conducted an investigation, with the result that on January 18, 1919, adverse proceedings were directed against the application for patent upon charges that no discovery of fuller's earth or other placer minerals had been made, and that the applicant was not on September 27, 1909 (the date of the withdrawal order) diligently prosecuting work leading to the discovery of oil or gas. Such charges were filed, and also on June 3, 1919, the Attorney General, at the request of the Secretary of the Navy, filed a protest. There had been no hearing on these adverse proceedings up to 1921.

On May 17, 1921, White and H. T. Coffin, the latter of whom had acquired an interest in the claim, wrote to Commander Landis for a compromise of the claim. The application called attention to the necessity for offset wells in section 2, and proposed to surrender their claim in exchange for a lease at 20 per cent. straight royalty covering a strip 900 feet wide along the entire north line of section 2.

The matter went the round of governmental agencies, but on June 28, 1921, Secretary Denby forwarded the correspondence from White and Coffin and from Landis to Fall with the comment that "it might be advisable to effect some sort of compromise," but with the additional statement: "In view of the weakness of this claim, it is believed that the claimants will compromise for a much smaller amount of land than they have indicated in the enclosed letter."

Fall referred the correspondence to Dr. Smith, Director of the Geological Survey, who in turn forwarded it to Mendenhall. Fall did not keep the latter informed of his plans after the break between the two, and when Dennett, attorney for White and Coffin, pressed the latters' claims, Mendenhall, about November 1, 1921, said that he did not know that Fall's policy had been determined, and

stated that Fall had taken personal charge. On November 3, 1921, Judge Finney tried to adjudicate the claim, and before he had received from Mendenhall the White and Coffin application for a compromise he wrote to the Commissioner of the General Land Office and asked for a disposition of the application to which he said his attention had been called. On November 10, 1921, Mendenhall sent the application to Judge Finney; on December 7, 1921, Judge Finney sent the papers to the Commissioner; and on December 24, 1921, Judge Finney wrote the Commissioner a second letter in which he said: "The Secretary was under the impression that this might be cleared up immediately. * * * Will you please have this case looked up thoroughly and the exact status ascertained and make any suggestions that occur to you which will aid in the very early disposition of same. * * *"

Delay occurred, and finally, on December 30, 1921, T. E. Klipstein and S. P. Wible, owners of the option on the White and Coffin claims, had a conference with J. Crampton Anderson at which they threatened court action if they did not obtain an overriding royalty on any lease which defendant might obtain on the lands in question. Anderson secured an option whereby he agreed to pay Klipstein and Wible an overriding royalty of $7\frac{1}{2}$ per cent. on any lease obtained by defendant under its bid if the Klipstein interests would agree to quitclaim to the government their rights under their application for patent. After the matter was brought to the attention of Doheny, on January 4, 1922, a contract embodying the terms of the above option was entered into between the defendant and White and Coffin and Wible and Klipstein. Judge Finney was immediately notified of this by wire, and on February 1, 1922, Cotter, at Judge Finney's suggestion, wrote the Department a letter under date of February 1, 1922, formally offering to deliver a quitclaim for the entire section 2 upon receiving the F lease on the royalty bid and a lease for the balance of the section at regulation royalties of $12\frac{1}{2}$ to 20 per cent. Fall approved their recommendation that the compromise be effected.

On February 8, 1922, the two leases were issued, one the F lease and the other the G lease. On that same day Secretary Fall asked the Pacific Oil Company for a nondrilling agreement with reference to the land in the center of the reserve, and this was agreed to within five days after the president of the latter company received the proposal. On Feb-

ruary 25, 1922, the contract of January 4, 1922, between appellee and the group composed of White, Coffin, Wible, Klipstein, and W. J. Williams was reduced to final form.

On May 24, 1922, Cotter applied to the Secretary of the Interior for a consolidation of the E, I, and G leases as a matter of convenience, since they all bore the same rates of royalties and were worded in the same form. The Bureau of Mines advised that there was no objection from its standpoint, and that in drawing up the new lease it might be consulted as to the statement of the drilling program. On June 2, 1922, Judge Finney directed the General Land Office to prepare the consolidated lease in consultation with the Bureau of Mines as to the drilling program. The lease was executed by Judge Finney for the United States and Cotter for the defendant on July 28, 1922.

Late in March or early in April, 1922, information leaked out that negotiations were pending for the leasing of the naval reserves. Rumors reached Congress, and, on April 14, 1922, that body passed a resolution introduced by Senator Kendrick. This resolution asked for confirmation and details with regard to the leasing of Teapot Dome. The resultant newspaper publicity and disclosures led to the La Follette resolution of April 21, 1922, which called for copies of all leases in all reserves and all papers pertaining to the administration of the reserves, and directed the Committee on Public Lands and Surveys to the Senate "to investigate this entire subject of leases upon naval oil reserves, with particular reference to the protection of the rights and equities of the Government of the United States and the preservation of its natural resources, and to report its findings and recommendations to the senate. * * *"

Secretary Fall responded by sending documents, comprising some 12,000 pages, among which were copies of the D, F, E, I, and H leases, and some of the papers pertaining to the issuance of the three leases involved in this suit.

The matter was investigated at great length by the Senate Committees, the progress of which investigation has been set forth in the first Pan-American Case.

During these investigations, Doheny, in two letters, offered certain conditions for surrendering other contracts, not in issue here, stated that he understood that there was no criticism of the small leases for "drainage" purposes, and that he took it "that the Committee and Congress will desire the con-

tinued operation of those wells in order that the Government's interests may be protected." Congress was unwilling to accept this offer.

On January 31, 1924, the Senate passed Joint Resolution No. 54, which was subsequently passed by the House of Representatives, and, on February 8, 1924, was approved by the President. The text of that resolution follows:

"Whereas it appears from evidence taken by the Committee on Public Lands and Surveys of the United States Senate that certain lease of Naval Reserve Numbered 3, in the State of Wyoming, bearing date April 7, 1922, made in form by the Government of the United States, through Albert B. Fall, Secretary of the Interior, and Edwin Denby, Secretary of the Navy, as lessor, to the Mammoth Oil Company, as lessee, and that certain contract between the Government of the United States and the Pan American Petroleum and Transport Company, dated April 25, 1922, signed by Edward C. Finney, Acting Secretary of the Interior, and Edwin Denby, Secretary of the Navy, relating among other things to the construction of oil tanks at Pearl Harbor, Territory of Hawaii, and that certain lease of Naval Reserve Numbered 1, in the State of California, bearing date December 11, 1922, made in form by the Government of the United States through Albert B. Fall, Secretary of the Interior, and Edwin Denby, Secretary of the Navy, as lessor, to the Pan American Petroleum Company, as lessee, were executed under circumstances indicating fraud and corruption; and

"Whereas the said leases and contract were entered into without authority on the part of the officers purporting to act in the execution of the same for the United States and in violation of the laws of Congress; and

"Whereas such leases and contract were made in defiance of the settled policy of the Government, adhered to through three successive administrations, to maintain in the ground a great reserve supply of oil adequate to the needs of the Navy in any emergency threatening the national security: Therefore be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the said leases and contract are against the public interest and that the lands embraced therein should be recovered and held for the purpose to which they were dedicated; and

"Resolved further, That the President of the United States be, and he hereby is, au-

thorized and directed immediately to cause suit to be instituted and prosecuted for the annulment and cancellation of the said leases and contract and all contracts incidental or supplemental thereto, to enjoin the further extraction of oil from the said reserves under said leases or from the territory covered by the same, to secure any further appropriate incidental relief, and to prosecute such other actions or proceedings, civil and criminal, as may be warranted by the facts in relation to the making of the said leases and contract.

"And the President is further authorized and directed to appoint, by and with the advice and consent of the Senate, special counsel who shall have charge and control of the prosecution of such litigation, anything in the statutes touching the powers of the Attorney General of the Department of Justice to the contrary notwithstanding." 43 U. S. Stat. part 1, page 5, chapter 16.

Under the authority of that resolution, the President appointed as special counsel the Honorable Owen J. Roberts and the Honorable Atlee Pomerene, who, on March 17, 1924, filed a bill of complaint in the District Court against the said transport company and this appellee, wherein the lands described in the leases dated June 5 and December 11, 1922, were sought to be recovered, and said leases and two contracts, dated April 25 and December 11, 1922, were sought to be canceled and an accounting had. The trial commenced on October 21, 1924; the opinion of the District Court was handed down on May 28, 1925; and the cause was finally decided by the Supreme Court on February 28, 1927, in favor of the plaintiff. As we have said, the instant suit was continued pending disposition of the former suit.

Appellant here has forty-one assignments of error, which may be more briefly summarized as follows:

(1) These leases were issued at the direction of Albert B. Fall, then Secretary of the Interior, after he had been given $100,000 by Edward L. Doheny, who was president, a director, and in control and domination, of the appellee on November 30, 1921. The I lease was the result of a joint adventure or conspiracy by Ramsey and the appellee, and was acquired by the appellee from Ramsey. The leases are conclusively presumed fraudulent and voidable by reason of said $100,-000 transaction.

(2) On or before November 30, 1921, Fall and Doheny conspired to defraud the United States by getting for the appellee oil and gas leases covering all the unleased lands in Reserve No. 1, and these leases are affected by and the result of that conspiracy, and, in the case of the I lease, the joint adventure or conspiracy by Ramsey and the appellee and Doheny.

(3) There was secrecy and favoritism in the making of leases without advertising, without competition, and without consideration other than royalties lower than those given to other lessees in the vicinity for similar lands. Legal advice was willfully avoided because of the possibility that it would be adverse to the right to make the leases. These facts not only evidence the actual fraud in and effect of the $100,000 transaction, and not only evidence the fraudulent conspiracy, but also are, in themselves, when taken together, fraud rendering the leases voidable.

(4) The leases were made to circumvent the law as in the first Pan-American Case.

(5) The E and I leases were made to give relief from the higher royalties of other leases, without authority of law therefor, and contrary to the Act of June 4, 1920 (34 USCA § 524).

(6) The G lease was made to compromise a placer mining claim for fuller's earth, without authority of law therefor, and contrary to said Act of June 4, 1920.

(7) The leases delegated discretionary power vested by law exclusively in the Secretary of the Navy to the Secretary of the Interior, and are thereby contrary to said Act of June 4, 1920.

The court below held that:

(1) The G and I leases were free from fraud and conspiracy, and were ratified by Congress.

(2) The E lease was voidable because of the fraud; but that it was unnecessary to find whether it had been ratified by Congress because the judgment in the former suit was a bar to this suit.

(3) In the first Pan-American suit neither the amended bill of complaint nor the answer thereto tendered any issue as to the validity of the E, G, or I leases or the consolidated lease, but that, in the trial of the first case, the plaintiff, as part of its proof to sustain its bill, placed in evidence substantially all the facts adduced in this suit as to the execution of the instant leases and the F, H, and D, leases, and requested and obtained from the court findings as to the execution of the instant leases.

Accordingly, it was held that the plaintiff is not entitled to any of the relief pray-

ed for, and the amended bill was dismissed [(D. C.) 45 F.(2d) 821]. Therefrom arises this appeal.

Three defenses are relied upon by the appellee:

(1) The admitted Fall-Doheny fraud and conspiracy, adjudicated in the first Pan-American Case, have not affected the three particular leases involved in the instant case.

(2) Even if it be conceded, for the sake of argument, that these three leases originally were tainted by the Fall-Doheny fraud, Congress, fully informed of the facts concerning that fraud, has seen fit to ratify the leases.

(3) If it be assumed, again for the sake of argument, that the three leases now in question were tainted by the Fall-Doheny fraud, and, further, that Congress has not ratified them, or any of them, recovery under them was a necessary part of the first Pan-American Case, these three leases constituting merely additional elements of relief to which the appellant was there entitled. Therefore, under the fundamental rule against splitting causes of action, the government, in this second suit, cannot recover under these three leases.

Since the briefs deal largely with these three defenses, rather than with the assignments of error, we are following the plan adopted by counsel, though we are not taking up the defenses in the precise order observed in the briefs.

Fraud is a short and ugly word in representative government. The appellee now concedes the existence of the fraud, and joins in the universal condemnation of it. That the conspiracy was a continuous service of favoritism by the Secretary of the Interior to the Doheny interests, affecting the leases in issue, and others, manifestly appears from the record. It permeates Fall's official domain in dealings with Doheny and oil reserves. A cordial friendship between Doheny and Fall existed for many years, and Fall, as Senator, prior to his appointment as Secretary of the Interior, had "rendered invaluable services" to the Doheny and other oil interests in Mexico and shortly before becoming Secretary of the Interior; also Doheny expected Fall to resign as Secretary of the Interior in 1922, something over a year after his appointment (no doubt after Doheny's oil interests in the reserve were established), and enter his employ.

The principal defense relied upon by the appellee is that all three of these leases were primarily entered into for "protection" of the naval petroleum reserve against drainage. It is true, the defendant argues, that two of the leases were for "relief," and that the third was executed to facilitate the compromise of a fuller's earth claim. These purposes, however, were only the "immediate" reasons for granting the leases; the protection of the oil stocks in the ground was the primary or ultimate reason, the defense insists.

Much expert testimony is cited in support of this contention. As might be expected, there is also testimony tending to show that 22 offset wells in section 1 were sufficient. We need not weigh this expert evidence, however, for an entirely different consideration is decisive of the issue.

Regardless of whether or not these particular leases were advantageous to the government, the fact that they were entered into by a faithless public officer on the one hand, and by Doheny, on the other, renders them voidable at the option of the defrauded principal—the United States of America. This fundamental principle of the law of agency is so lucidly expounded by the Supreme Court in the first Pan-American Petroleum Company Case that it almost is unnecessary to cite further authorities: "It was not necessary to show that the money transaction between Doheny and Fall constituted bribery as defined in the Criminal Code or that Fall was financially interested in the transaction or that the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough that these companies sought and corruptly obtained Fall's dominating influence in furtherance of the venture. It is clear that, at the instance of Doheny, Fall so favored the making of these contracts and leases that it was impossible for him loyally or faithfully to serve the interests of the United States." First Pan-American Case, supra, 273 U. S. 500, 47 S. Ct. 416, 422, 71 L. Ed. 734.

Mr. Justice Butler, who delivered the opinion in the first Pan-American Case, used similar language in Mammoth Oil Co. et al. v. United States, supra, 275 U. S. at pages 50 and 53, 48 S. Ct. 1, 9, 72 L. Ed. 137:

"And the clandestine and unexplained acquisition of these bonds by Fall confirms the belief, generated by other circumstances in the case, that he was a faithless public officer. * * *

"The complaint did not allege bribery; and, in the view we take of the case, there is

no occasion to consider, and we do not determine, whether Fall was bribed in respect of the lease or agreement. It was not necessary for the government to show that it suffered or was liable to suffer loss or disadvantage as a result of the lease or that Fall gained by or was financially concerned in the transaction. Pan-American Case, supra, 273 U. S. 500, 47 S. Ct. 416, 71 L. Ed. 734. It requires no discussion to make it plain that the facts and circumstances above referred to require a finding that, pending the making of the lease and agreement, Fall and Sinclair, contrary to the government's policy for the conservation of oil reserves for the navy, and in disregard of law, conspired to procure for the Mammoth Company all the products of the reserve on the basis of exchange of royalty oil for construction work, fuel oil, etc.; that Fall so favored Sinclair and the making of the lease and agreement that it was not possible for him loyally or faithfully to serve the interests of the United States or impartially to consider the applications of others for leases in the reserve; and that the lease and agreement were made fraudulently by means of collusion and conspiracy between them."

There is nothing in these three leases that purges them of the fraud. Indeed, they are nearer, in point of time, to the "$100,000 transaction" of November 30, 1921, than were the leases set aside in the first case.

Nor need it be shown that the conspirators had these particular leases in mind when the sinister transaction took place. Conspirators are too resourceful to lack pretexts for carrying out their corrupt schemes; but such pretexts usually are fabricated as the occasions arise. Such devices need not be provided for in detail, years in advance.

We know of no rule of law which requires the details of a conspiracy to be completely worked out in advance, in order to bring given acts within the scope of the general plan. Fall's letter to Admiral Robison, dated November 29, 1921—on the eve of the ill-starred gift—shows that the former had not yet entirely formulated his plan for delivering to his friend and benefactor "oil and gas leases covering all the unleased land in the reserve." First Pan-American Case, supra, 273 U. S. at page 500, 47 S. Ct. 416, 422, 71 L. Ed. 734.

During the oral argument before this court, counsel for the defendant conceded: "Anything that Fall touched was wrong!" We believe that counsel's candid statement is an accurate epitome of the part that fraud played in these three leases.

When Fall accepted the "loan" from Doheny, he became thereafter incapable of properly representing the United States of America in any dealings with his benefactor. The fact that the defrauded principal occasionally may be benefited by certain transactions entered into in his name by the disloyal agent does not deprive the principal of his right to repudiate the bargain.

When Fall and Doheny entered into what the Supreme Court has denominated "a conspiracy," they poisoned the spring of fair dealing between the government, which Fall purported to represent, and the Pan-American Company, which was admittedly dominated by Doheny at the time the transaction took place. The whole course of dealing reeked with wrong.

"If a governmental official, engaged in making contracts for the government, receives pecuniary favor from one with whom such contracts are made, a fraud is committed on the government, and it matters not that the government is subjected to no pecuniary loss, or that the contract might have been an advantageous one to it. The entire transaction is tainted with favoritism, collusion, and corruption, defeating the proper and lawful function of the government." United States v. Mammoth Oil Co. et al. (C. C. A. 8) 14 F.(2d) 705, 717, affirmed 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. 137, supra.

Indeed, the lower court found that "the 'E' lease was voidable at the instance of the United States, because contra bonos mores and against public policy by reason of the relations existing at the time of its execution between Doheny and Fall."

We are unable to follow the reasoning of the learned judge below as to how the G and I leases may be distinguished from the E lease with regard to the effect of the fraud.

We now turn to an examination of the law and the facts regarding the I lease, which was executed originally to Ramsey and was by him later transferred to the defendant-appellee.

Fall's dominance over the Navy Department's official relation to the oil reserve is obvious. Robison, it appears, was "concerned only with national defense," and Fall was not oblivious of the fact. A policy of the Navy had long prior been established, and studiously followed, to lease strips of land, not to exceed 900 feet, adjoining other lands to conserve the oil against drainage

by other owners. Leases D, for 14 wells, and H, for 8 wells, had been granted to defendant Doheny and United Midway (Ramsey) at a royalty of 55½ per cent. Ramsey succeeded to the Midway interests, and shortly thereafter, when only 3 wells had been completed in H and 5 in D, Ramsey, through Staggers, his attorney, a former director and attorney for United Midway, applied to Secretary Fall for reduction of royalties, which application was denied. Thereafter, on October 19, 1921, A. J. Pizzini, a director and vice president of Continental, wired Ramsey that it might be a good time to request reduction of royalty, "if I can see Doheny here and get him to join in petition," and "you might also use this argument in effort to get oil purchase money reduced by stating that it would not pay us to continue further development." Doheny and his attorney Cotter became interested, and applications were made for reduction of royalties, on November 22, 1921, by defendant and on November 23, 1921, by United Midway (Ramsey). These were denied by Judge Finney and report made to Fall. Upon Doheny interests' entering into the matter of reduction, Fall extended a "listening ear," and stated that additional land might be granted at a lesser royalty. November 29, 1921, Fall called Doheny over long-distance telephone, and November 30 Doheny sent Fall the $100,000.

On November 28, 1921, Doheny wrote Fall: "Along the lines of your suggestion, I have made some inquiries regarding the cost of constructing tanks for the storage of one and one-half million barrels of fuel oil at Pearl Harbor. * * * I am confidentially furnishing Mr. Cotter with the information so that he can intelligently discuss the matter with Mr. Finney."

November 29, 1921, Fall wrote Robison, who represented the Navy, as follows: "Mr. Cotter will wait upon you with data. * *. * I have asked him to hand you for your inspection the original letter from Colonel Doheny, addressed to myself, containing résumé of data. Should you think best to accept this proposition, then, of course, it would be necessary, in my judgment, to turn over to Colonel Doheny, if we can do so, leases upon further wells, or area in the naval reserve in which he is now drilling. If this is done it must be understood that the royalty must be made less than the present royalties being paid by the Midway and Pan American."

After receipt of the $100,000, Fall went to his New Mexico home on December 1, and December 6 Staggers wired Ramsey: "Sec-

retary Fall will be in Riverside the 9th. * * * Secretary Fall's secretary suggests that you wire him for interview as he is familiar with our proposition and will see you."

Fall's secretary was obviously familiar with the entire plan. A conference had been had between Fall and Doheny, and Fall advised his assistant to execute leases, the I lease to Ramsey, comprising about 60 acres in section 1, immediately south of H, and the remainder of section 1, 421 acres, the E lease, to the defendant company, both at royalties of from 12½ to 25 per cent. Doheny, by letter of December 14, 1921, authorized Cotter to execute the lease for the defendant company. The leases are dated December 14, 1921. Nothing was said at any time, either orally or in writing, that the leases were given as drainage necessities, and only 8 of the 22 wells directed by leases H and D had been drilled.

On March 10, 1922, 86 days after the date of I lease, carrying a royalty of 12½ to 25 per cent., which adjoins H, at a royalty of 55½ per cent., received after competitive bidding, and for which abandonment was to be urged, Doheny paid to Ramsey $450,000 for H lease, and $300,000 for I lease, in issue, which was granted without notice or invitation of bids. Thus, defendant had its E lease of 421 acres at a royalty of 12½ to 25 per cent. adjoining D at a royalty of 55 per cent. On the acreage basis of value Doheny paid for the I (Ramsey) lease of 63.2 acres, defendant's E lease was worth nearly $2,000,000 above the royalty pledged to the United States. Undoubtedly the I and E leases were a part of the conspiracy.

The G lease was granted in section 2, adjoining F lease. Bids had been called for from some of the prominent oil companies, and defendant's bid was among the highest—35 per cent.

White and Coffin objected, claiming placer mining locations prior to the creation of the reserve. These claims had been adversely reported, and the Attorney General, at the request of the then Secretary of the Navy, had filed formal protest against allowance of the claims. Secretary of the Navy Denby sent a copy of the White and Coffin correspondence to Fall. White and Coffin proposed a compromise, a lease on a strip 900 feet wide along the north line of section 2 at a 20 per cent. royalty. This was not accepted, but Cotter, attorney for defendant, after exclusive information as to conditions under which lease would be made, obtained a quitclaim deed, through Anderson, of the White and Cotter interests to the United States, and wired such

fact to the Interior Department. The submitted bid was accepted, and G lease followed, comprising 176.78 acres, and the quitclaim was delivered to the United States. This was February 8, 1922, 70 days after the receipt of the $100,000 by Fall. For the quitclaim the defendant company agreed to pay, on condition the bid was accepted, to the White and Coffin interests a 7½ per cent. overriding royalty. Based on the valuation paid by Doheny for the Ramsey I lease, there was a very great difference between the value received by Doheny and the royalties paid to the government and to the White and Coffin interests.

■ From the foregoing, it will be seen that Ramsey and his associates were joint adventurers with the defendant in seeking relief from the high royalties paid on the H lease; such relief being given by the award of the I lease, which is one of the three attacked in this suit. Though it has not been shown that the Ramsey interests themselves were guilty of corrupt practices, the I lease was rendered voidable by the government for the fraud of Doheny, Ramsey's coadventurer.

This rule of law, of course, is axiomatic as to criminal conspiracies, as well as in the fields of agency and partnership. But it is also applicable as among joint adventurers in general.

In Hitchman Coal & Coke Co. v. Mitchell, Individually, et al., 245 U. S. 229, 249, 38 S. Ct. 65, 72, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, the Supreme Court said: "In order that the declarations and conduct of third parties may be admissible in such a case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves. The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them." (Many cases cited.)

■ The appellee contends that this "subsidiary conspiracy" or joint adventure of Doheny and Ramsey should have been pleaded by the government. The answer, of course, is that this joint adventure is not of itself part of the cause of action, but is merely an evidentiary matter to be proved in connection with the major conspiracy; i. e., the one between Doheny and Fall. That conspiracy, of course, is fully set out in the amended complaint.

■ Furthermore, the subsidiary joint adventure itself is sufficiently suggested in the amended complaint, as follows: "Notwithstanding it was the duty of the Secretary of the Interior, if he had any authority to lease said premises last above mentioned [Visalia 010043 or I lease], to lease them at the highest royalties obtainable, and to the best advantage of the United States, he without authority, without advertising, without competition, and without consideration other than the royalties therein provided for, privately granted said lease to the said W. R. Ramsey, and which was thereafter, as aforesaid, duly assigned by the said W. R. Ramsey to the Pan-American Petroleum Company, the defendant herein, for royalties lower than were given to other lessees for similar lands in said vicinity, and because of the desire of the said Albert B. Fall to favor the said W. R. Ramsey and the said E. L. Doheny, and the defendant company, and in pursuance of said agreement and conspiracy, and for the purposes herein set forth, and in fraud of the United States, and particularly for the purpose of relieving the said W. R. Ramsey and his assignee, the Pan-American Petroleum Company, defendant herein, from the payment of the high royalties, amounting to 55½ per cent., under the said lease dated July 12 [8], 1921, which granted to the United Midway Oil Land Company the right to drill eight wells on the premises hereinbefore described, as hereinbefore set forth, which said lease was thereafter assigned to one W. R. Ramsey, and by him assigned, on March 25, 1922, to the Pan-American Petroleum Company."

■ But, even if it be contended that Doheny's fraud is not imputable to Ramsey, the appellee's position is not improved. When the Pan-American Company acquired the I lease from Ramsey, the company, through Doheny, its moving spirit, was well aware that the lease originally had been awarded to Ramsey as a coadventurer with Doheny. The company was also aware of the $100,000

transaction above referred to. Such guilty knowledge was sufficient to taint the lease with fraud—so far as the defendant-appellee was concerned—even if it be conceded, argumentatively, that the lease left Ramsey's hands untarnished.

It is well established that, in such a case, the petroleum company was chargeable with the knowledge that the United States parted with the possession of the I lease as a result of the fraud of Fall and Doheny, even if the intermediate link in the chain of title, i. e., Ramsey, was innocent of wrong.

In Independent Coal & Coke Co. et al. v. United States et al., 274 U. S. 640, 647, 648, 47 S. Ct. 714, 717, 71 L. Ed. 1270, Mr. Justice Stone said: "It is ancient and familiar learning that one who fraudulently procures a conveyance may not defeat the defrauded grantor or protect himself from the consequences of his fraud by having the title conveyed to an innocent third person. [Cases cited.] Equity may follow the property until it reaches the hands of an innocent purchaser for value. Even then the wrongdoer may not reacquire it free of the obligation which equity imposes on one who despoils another of his property by fraud or a breach of trust. The obligation in personam to make restitution persists and may be enforced by compelling a return of the property itself whenever and however it comes into his hands. [Cases cited.] So also, a purchaser with notice of an outstanding equity, despite a transfer to an innocent purchaser for value, may not on a later repurchase hold free of the equity. [Cases cited.] So here the obligation, having its inception in the fraud which was established in the first suit, has been confirmed by the decree and persists as to every interest acquired by petitioners under the contracts with the state or which may be enjoyed by them as the fruit of their fraud, even though we assume for the moment that the title acquired by them could not have been challenged while in the hands of the state."

An earlier statement of the same doctrine is found in Rogers v. Lindsey et al., 13 How. (54 U. S.) 440, 445, 446, 14 L. Ed. 215: "A purchaser with notice may protect himself by obtaining the title of a purchaser for a valuable consideration without notice, unless he be the original party to the fraud. The bona fide purchase purges away the equity from the title in the hands of all persons who may obtain a derivative title, except it be that of the original party, whose conscience stands bound by the violation of the trust, and a meditated fraud."

Quite aside from the question of fraud, however, it may be noted in passing that these three leases were executed for illegal purposes; i. e., the E and I leases, for relief against high royalties in other leases, and the G lease, to compromise a mining claim. The appellee concedes that these purposes were in the minds of the lessees when the lands were secured by them, but contends that "the purpose of the government officials in granting these leases was protection against drainage."

Each of these three leases was signed by E. C. Finney as Assistant Secretary of the Interior. None was signed by any official connected with the Navy Department.

The lower court held, and, we believe, correctly, that "the * * * Executive Order of May 31, 1921, attempting to transfer the administration of the Naval Petroleum Reserves from the Secretary of the Navy to the Secretary of the Interior, was invalid." The same court, however, also reached the conclusion of law that Judge Finney executed the leases "at the direction and with the consent of and later ratification by the Secretary of the Navy."

While we believe that the Secretary of the Navy did not as a matter of fact consent to or ratify these leases, but, on the contrary, abdicated in favor of the Secretary of the Interior in the matter of administering the Naval Petroleum Reserves, we regard this question as moot in this case.

The reason for our view is that neither the Secretary of the Navy nor the Secretary of the Interior had, under the statutes, the authority to lease the nation's oil reserves either for relief against higher royalties in other leases or for the compromise of fuller's earth claims.

In the opening paragraphs of this opinion, we have outlined the salient statutes and executive orders dealing with the naval petroleum reserves. We will not refer to those provisions again, save to emphasize the principle that we believe controlling here; namely, that the reserves were not to be used as pawns, either for royalty relief or litigious compromise. Their true purpose was well expressed by President Taft to be "for the exclusive use or benefit of the United States Navy." Section 1 of the Act of June 4, 1920 (34 USCA § 524), provides that the reserves are to be used "for the benefit of the United States."

Both relief from excessive royalties and the compromise of claims are, indeed, under certain conditions, authorized by statute—

but the statutes were not observed, either in letter or in spirit, in connection with these three leases.

Section 17 of the General Leasing Act of February 25, 1920 (30 USCA § 226), which we have heretofore quoted, provides in part: "Whenever the average daily production of any oil well shall not exceed ten barrels per day, the Secretary of the Interior is authorized to reduce the royalty on future production when in his judgment the wells can not be successfully operated upon the royalty fixed in the lease. The provisions of this section shall apply to all oil and gas leases made under this subchapter."

There is no suggestion in this case that the E lease or the I lease was given because the production of any of the wells in the D lease or the H lease had fallen to 10 barrels or less. Indeed, Fall conceded that the royalties could not be reduced because they had been fixed as the result of competitive bidding.

But Fall or one of his assistants, it does not matter which, suggested that "some relief in the way of additional leases might be considered." In other words, the Department of the Interior tried to do indirectly what it admitted it could not do directly. And the defendant-appellee now asks that such trifling with the law be sustained by the courts.

Even if relief had been permissible in the instant case, we find no statutory authority for the form which that relief assumed; namely, the leasing of additional land. We do not believe that Congress intended to open the door to any such chicanery as was practiced by Fall and Doheny in the matter of these so-called "relief leases," E and I. Those leases were contrary, not only to good morals, but were unauthorized by statute law, either under the Act of February 25, 1920, or the Act of June 4, 1920.

Section 18a of the former act, quoted under 34 USCA § 524a, provided: "That whenever the validity, of any gas or petroleum placer claim under pre-existing law to land embraced in the executive order of withdrawal issued September 27, 1909, has been or may hereafter be drawn in question on behalf of the United States in any departmental or judicial proceedings, the President is hereby authorized at any time within twelve months after the approval of this Act to direct the compromise and settlement of any such controversy upon such terms and conditions as may be agreed upon, to be carried out by an exchange or division of land or division of the proceeds of operation."

While a study of the Act of February 25, 1920, will disclose a number of provisions that preclude its being invoked to justify the G lease, which was made to compromise the White and Coffin fuller's earth claim, a decisive answer to any such attempted justification is found in the fact that the President's power to act, under section 18a, expired on February 20, 1921, nearly one year prior to the execution of the G lease.

Indeed, we do not believe that the appellee seriously rests its contention that these leases are valid upon either the ground that E and I were for relief or that G was a compromise for the White and Coffin claim. In its brief the appellee says, as a caption to one of the subdivisions of its argument: "The facts that the E and I leases may have been sought by the defendant and Ramsey to relieve them from the excessive royalties of the H and D leases, and that the immediate occasion of granting the G lease was to clear Section 2 of adverse mining claims, do not indicate fraud, nor alter the fact that, as found by the District Court, the primary or dominant purpose for granting them was to protect the reserve from drainage."

In this connection, it is interesting to observe that Judge Finney was unable "to explain why so much greater acreage was given to the Pan American for relief than was given to Mr. Ramsey. The Secretary didn't give any reason for it to me." Admiral Robison stated: "I do not know why the one man should receive only a little more than as many acres as he had, and the other man get over four times as many acres."

"Protection of the naval petroleum reserves against drainage" would indeed have been a worthy reason for executing any or all of these three leases. It would have been a reason that would have influenced a patriot, who sought the conservation of his country's natural resources as a possible source of national defense.

But, unfortunately, a study of the present record discloses that Fall did not hesitate to employ lofty language to conceal his duplicity. Thus, in his letter to the Senate Committee on Public Lands, Fall rounded out his deliberate falsehood as to his dealings with Sinclair and Doheny with the following high-sounding paragraph: "I shall go into no further detail in discussing this matter. The entire subject, of course, is more or less humiliating even to refer to."

A close study of the record convinces us that the alleged "protection" was in reality only a pretext, by means of which Doheny

was to become master of part of the nation's oil reserves.

■ These three leases were vitiated by the same fraud that was condemned by the Supreme Court in the first case. We find nothing in the record to purge them of that fraud.

Appellee's contention with regard to congressional ratification of these leases is thus outlined in its brief: "It is our purpose to show that Congress was fully advised of the terms and provisions of the E, G and I leases, as well as the terms and provisions of all the other leases in Reserve No. 1 and Reserve No. 2, and of the circumstances under which each and all of the leases in both reserves were executed; and that it evidenced a clear intention to approve the leases in both Reserves Nos. 1 and 2 other than those specifically condemned."

■ At the outset, it may be observed that, as was stated by the lower court as to the E lease, which it found to be contra bonos mores: "Courts should be reluctant, however, to hold a ratification by Congress where questions of fraud enter into consideration if the cause can be determined upon other questions presented."

We have already set forth verbatim the text of Senate Joint Resolution No. 54. It is to this document, chiefly, that we must look for ratification by Congress, if such ratification is to be found. In it is expressed the legislative mandate that certain suits be brought. In it is inscribed the commission received by special counsel to institute and prosecute suit for the annulment and cancellation of *certain* "leases and contract."

■ Appellee concedes that there has been no express ratification by Congress, but contends that the latter has approved all three leases by implication. Even if it be granted that it is possible for the lawmaking power to ratify such leases by implication, three elements must concur before such ratification in any event can be presumed:

(1) The language used by Congress must be indefinite and ambiguous, so as to require interpretation by the consideration of extraneous matter.

(2) The implication to ratify must be clear.

(3) Congress must have had before it *all* the material facts relative to the fraud.

We will consider these elements in the order named.

■ After specifying certain leases, not involved in the instant case, Senate Joint Resolution No. 54 (43 Stat. 5) proceeds to say: "Resolved further, That the President of the United States be, and he is, authorized and directed immediately to cause suit to be instituted and prosecuted for the annulment and cancellation of the said leases and contract and all contracts incidental or supplemental thereto, to enjoin the further extraction of oil from the said reserves under said leases or from the territory covered by the same, to secure any further appropriate incidental relief, and to prosecute such other actions or proceeding, civil and criminal, as may be warranted by the facts in relation to the making of the said leases and contract."

We believe that a careful study of the foregoing paragraph will disclose that Congress desired "immediate" executive action regarding certain "leases and contract" specified in the resolution "and all contracts incidental or supplemental thereto." We believe that this clear language does not support the intendment that Congress thereby foreclosed future executive action regarding other contracts not "incidental or supplemental thereto."

In United States et al. v. Missouri Pacific Railroad Co., 278 U. S. 269, 277, 278, 49 S. Ct. 133, 136, 73 L. Ed. 322, Mr. Justice Butler said: "We are therefore bound by the words employed and are not at liberty to conjure up conditions to raise doubts in order that resort may be had to construction. It is elementary that, where no ambiguity exists, there is no room for construction. Inconvenience or hardships, if any, that result from following the statute as written, must be relieved by legislation. * * * Construction may not be substituted for legislation. [Cases cited.]

"Appellants seek to support the view for which they contend by some of the legislative history of the enactment and especially by explanatory statements made by Senator Elkins in connection with the report of the majority of the Senate committee submitting the bill for the act in question. Where doubt exists and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure, and other like extraneous matter, may be taken into consideration to aid in the ascertainment of the true legislative intent. But where the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used

to support a construction that *adds to* or takes from the significance of the words employed. [Cases cited.]" (Italics our own.)

Again, in Wabash R. Co. v. United States (C. C. A. 8) 178 F. 5, 11, 12, 21 Ann. Cas. 819, we find the following language: "The bill, the debates upon it, and the act fail to convince that the members of Congress ever had any intention to make any of these exceptions. If, however, such an intention ever existed, it was a secret intention that is not expressed in the statute. And it is the intention expressed in the statute, and that alone, to which the courts may lawfully give effect. They may not assume or presume purposes and intentions that the terms of the law do not indicate, and then enact and expunge provisions to carry out those supposed intentions. The act must be held to mean what it clearly expresses. [Cases cited.]" See, also, Duke Power Co. v. Commissioner of Internal Revenue (C. C. A. 4) 44 F.(2d) 543, 545; certiorari denied 282 U. S. 903, 51 S. Ct. 217, 75 L. Ed. 795.

 Secondly, implied ratification is not to be presumed, particularly when, as here, there are involved questions of fraud and of the derogation of certain statutory powers of the Attorney General and his office.

To assume that Congress, by its silence, intended that all leases not designated for attack by special counsel should be undisturbed, would involve, by necessary implication, the proposition that Congress desired to foreclose executive action, authorized by existing statute, as to the unnamed leases.

Frequent reference has been made in the briefs to the fact that "Congress directed the employment of special counsel because it had lost all faith in the then Attorney General and the Department of Justice as administered by him." While this will be freely conceded, it does not necessarily follow that Congress had lost faith in the *office* of Attorney General or in the Department of Justice as one of the co-ordinate branches of our government. Ours is a government not of men, but of laws. While a given incumbent of public office may prove unfaithful, there is no ground for the view that thereafter the same office may not be filled by some other individual possessing the requisite ability and integrity.

Is it not reasonable to assume that Congress, becoming aware that the nation's oil reserves were being raided, commanded *immediate* executive action as to certain transactions that were *even then* very questionable?

This does not mean that Congress intended that there should be no *future* executive action taken as other frauds were unearthed, and when worthier men occupied public office.

 In arguing another point—that concerning split causes of action—appellee says: "Now, there is no rule of law better settled than that an act of Congress or of a legislature is not to be construed as impairing any existing substantive or procedural right unless such intent is clearly, and without ambiguity, written into the act."

This same principal of law may be invoked to support the view that Congress did not intend to modify the authority of the Attorney General as to any leases not specified in Resolution No. 54.

In United States v. Barnes, 222 U. S. 513, 520, 32 S. Ct. 117, 118, 56 L. Ed. 291, cited by the appellee, the court said:

"Much of our national legislation is embodied in codes, or systematic collections of general rules, each dealing in a comprehensive way with some general subject, such as the customs, internal revenue, public lands, Indians, and patents for inventions; and it is the settled rule of decision in this court that where there is subsequent legislation upon such a subject, it carries with it an implication that the general rules are not superseded, but are to be applied in its enforcement, save as the contrary clearly appears. Thus, in Wood v. United States, 16 Pet. 342, 363, 10 L. Ed. 987, 995, where a question arose as to what effect should be given a general provision of an early customs law in view of a later enactment upon that subject, it was said:

" 'And it may be added that, in the interpretation of all laws for the collection of revenue, whose provisions are often very complicated and numerous to guard against frauds by importers, it would be a strong ground to assert that the main provisions of any such laws sedulously introduced to meet the case of a palpable fraud should be deemed repealed, merely because in subsequent laws other powers and authorities are given to the customhouse officers, and other modes of proceeding are allowed * * * in order to ascertain whether there has been any fraud attempted upon the government. The more natural, if not the necessary, inference in all such cases is, that the legislature intend the new laws to be auxiliary to and in aid of the purposes of the old law, even when some of the cases provided for may equally be within the reach of each.

There certainly, under such circumstances, ought to be a manifest and total repugnancy in the provisions to lead to the conclusion that the latter laws abrogated, and were designated to abrogate, the former.'"

[21] As we study Resolution No. 54, we do not find "a manifest and total repugnancy" between its mandate to the President to appoint special counsel to institute proceedings for the cancellation of the leases therein designated, and the general authority of the Attorney General's *office* to bring suit to cancel any or all other leases not set forth in the resolution.

[22] Normally, Congress acts, not by silence, but by legislation. This principle was recognized by the Supreme Court in United States v. Southern Pacific Co. et al., 259 U. S. 214, 234, 42 S. Ct. 496, 500, 66 L. Ed. 907: "It is true, as is argued at length by counsel for the defendants, that Congress had opportunity by the reports of its committees, and otherwise, to learn of this lease; but we are referred to no legislation passed by Congress authorizing or approving of it. In our view the lease for 99 years by the Central Pacific to a rival and competitive company could not legally be made without authorization by federal legislation. In the absence of such action the Central Pacific had not the corporate capacity to make the lease."

With how much more force could it be said that leases executed or authorized by an unworthy public official required "federal legislation" of the most definite and explicit character, before it could be contended that Congress had "approved" of them.

The case of United States v. Chemical Foundation (C. C. A. 3) 5 F.(2d) 191, 210, modified and affirmed 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131, is in point. There Judge Woolley said: "While on the subject of confirmation and ratification we shall briefly dispose of two contentions of The Foundation: One is that the transaction was also ratified by Congress. This is based on the inaction of Congress following its receipt, on March 1, 1919, of Mr. Palmer's report to the President showing the proposed sale to The Foundation and the reasons therefor. Congress cannot be estopped by its silence from exercising its constitutional power of legislation. Nor does the silence of Congress indicate its approval or disapproval of matters coming to its knowledge in the course of its deliberations. The only significance of submitting the report of the proposed transaction to Congress and through Congress to the public is that such an act is unusual for one engaged in a conspiracy against the Government."

If further authority be required for the view that Congress did not intend to change, by implication, the existing statutes as to the general powers of the Attorney General with reference to such leases, it is to be found in an eminent text quoted by the appellee itself:

"It is presumed that the legislature does not intend to make any change in the existing law beyond what is expressly declared. And this presumption applies to the common law as well as to statutes. Hence repeals by implication are recognized only when there is an unavoidable contradiction. And for a like reason statutes in derogation of the common law are strictly construed unless controlled by some other rule of construction. The presumption is against any radical change of legislative policy.

"It is presumed, in the construction of general words or dubious provisions, that there is no intention to depart from any established policy of the law; to innovate upon fundamental principles; nor to oust the jurisdiction of the superior courts, or establish new jurisdictions, especially exclusive jurisdictions. There is also a presumption against any intention to surrender public rights, or to affect the government." Sutherland, "Statutes and Statutory Construction" (2d Ed.,) § 499, p. 931.

[23, 24] We do not believe that the courts, in interpreting Senate Joint Resolution No. 54, should impute to Congress an intention to curtail the "jurisdiction" of the Attorney General or the Department of Justice beyond the limits set out in the resolution itself. Nor should there be attributed to Congress a secret intention to "surrender public rights" by forbidding future Attorney Generals to bring such suits for the cancellation of other oil leases as they might deem advisable under the then known circumstances.

The appellee attempts to answer this argument by the following contention: "The approval of these leases by Congress did not in any way affect the laws governing the duty of the Attorney General or the Department of Justice. Had Congress especially passed an act stating that upon full investigation it did not believe these leases were executed as part of the fraudulent scheme, or that, if so executed, Congress believed they were still for the best interests of the Government, it could not be claimed that such direct ratification would in any way affect or deal with

or impliedly repeal any law governing the duty of the Attorney General. It would simply mean that if, notwithstanding Congressional approval, the Department of Justice should institute an action for the cancellation of the leases, the defendant would have a complete defense based upon Congressional approval. Ratification by implication, that is, by acts of Congress so clear as to leave no possible doubt that Congress did approve the leases, has precisely the same effect."

But it might well have been said, if Congress had given "charge and control" of litigation as to certain named leases to special counsel, and had expressly ratified *all* other leases not specifically condemned, that Congress had indeed deprived the office of Attorney General of any jurisdiction as to the unnamed leases. It would not be supposed that Congress would expect that the Attorney General would file suits to cancel the ratified leases, only to be met by the defense of congressional ratification. The Department of Justice could not be presumed to indulge in such idle gestures.

If ratification by silence was intended by Congress as to these three leases, it must have been intended as to all other leases not specified in Resolution 54 and not "incidental or supplemental" to the leases therein named.

It is true that this court, in United States v. Belridge Oil Company, 13 F.(2d) 562, 564, held that Congress "at no time expressed disapproval" of the naval petroleum reserve leases. But it will be noted that Judge Gilbert, with his characteristic ability to get at the heart of a matter, prefaced his opinion as to the legality of the lease there in question with these words: "There being no suggestion of fraud in connection with the execution of the lease, or of mala fides on the part of any of the parties thereto. * * *"

These qualifying words at once set the Belridge Case apart from the instant suit, in which fraud and mala fides have not only been "suggested," but have been specifically and in detail set forth in the pleadings and briefs.

A study of congressional history leads us to the conclusion that the Senate did not desire to ratify *any* leases by implication. Time and again it emphasized that its investigation of the naval petroleum reserves was not completed. We quote but a few such expressions, both by the Senate and by its Committee on Public Lands and Surveys:

"January 9, 1928:

"(S. Res. 101, Seventieth Congress, first session)

"Resolution.

"Whereas in the Sixty-seventh Congress the Senate passed Senate Resolutions 282 and 294, which resolutions directed the Committee on Public Lands and Surveys to investigate the entire subject of the leases upon naval oil reserves with particular reference to the protection of the rights and equities of the Government of the United States and the preservation of its natural resources; and

"Whereas said committee never completed said investigation, the same having been suspended because of the refusal of one Harry F. Sinclair to answer the questions of the committee, and said committee has never made any final report to the Senate; and [here follow two paragraphs dealing with the Sinclair-Fall transaction]

"Resolved, That the said Committee on Public Lands and Surveys be and it is hereby authorized and directed to renew and to continue the investigation provided for in said Resolutions 282 and 294, and said resolutions are hereby renewed as fully and as completely as though they were herein fully set forth. * * *"

On May 29, 1928, Senator Nye, who had become chairman of the Committee on Public Lands and Surveys, submitted a report in which it was stated:

"(4) It is further felt that any final report should include a review of the contention of those men and institutions which have been thrown on the defensive as a result of the disclosures made by the investigation; that such a review should be offered for the purpose of showing how unreasonable their contention often has been, and how evasive, misleading and false these men have been in many cases while presuming to throw light upon the matter under inquiry and while under oath to tell the truth, the whole truth and nothing but the truth. * * *

"THIS REPORT NOT FINAL.

"This report should under no circumstances be considered necessarily a final report." (Capitalization that of the record.)

It will be noted that these expressions represent the Senate's view as to the conclusiveness of its investigation as of 1928, three years and a half after the instant suit was filed. It would not be dealing fairly with Congress to force into its mouth implied ratification of these leases, when, comparatively recently, it so clearly indicated that it had not yet completed its investigation.

Indeed, so far as this court knows, the investigation has not been completed at the present writing.

Finally, ratification of the fraudulent acts of an agent can be made only when the defrauded principal has "full knowledge of all the facts." The doctrine was lucidly expounded in Marshall County v. Schenck, 5 Wall. (72 U. S.) 772, 781, 18 L. Ed. 556: "Questions of ratification most frequently arise in respect to the acts or omissions of agents, but the general rule is the same in all cases where the act done was one which it was competent for the party attempted to be charged to do. When the principal, upon a full knowledge of all the circumstances of the case, deliberately ratifies the acts, doings, or omissions of his agent, he will be bound thereby as fully, to all intents and purposes, as if he had originally given him direct authority in the premises, to the extent which such acts, doings, or omissions reach." See, also, City of Findlay v. Pertz et al. (C. C. A. 6) 66 F. 427, 428, 29 L. R. A. 188.

Senate Joint Resolution No. 54 was passed by the upper house on January 31, 1924, and was approved by the President on February 8, 1924. The appellee relies largely upon this resolution as indicating congressional ratification: "What, then, was the necessary effect on Congress singling out these specific leases for condemnation, and not mentioning any of the others? To the ordinary mind it would seem that there could be but one answer, and that is, that Congress did not desire actions brought to cancel any of the other leases."

On February 1, 1924, the day after the Senate had passed the resolution, Doheny returned to the stand before the committee, and gave certain sensational testimony that the Senate had not had before it on the day it passed the resolution. We adopt the appellee's digest of Doheny's testimony, in part:

"Doheny * * * exhibited to the committee a note for $100,000 without any signature, stating that the signature had been torn from the note by himself and his wife; that the note had been found in New York, but he thought the signature was in Los Angeles. Under cross-examination, he then admitted for the first time that he had not obtained the $100,000 on his own personal check, but had sought to further cover up the transaction by obtaining it on the check of his son; that the money had been sent in response to a telephone request from Fall received by

him at New York; that no entry had been made in any of his books showing this loan to Fall. At the time of the last examination, he knew the committee was very suspicious of the entire transaction; that he was to tell the whole truth, but only when he was asked questions which would bring it out. While he had the note in his possession at that time, he did not think it was a note because the signature had been detached and, therefore, he thought it was proper to withhold it, adding:

*" 'I am not here attempting to answer questions as to whether I told the truth or not.' "*

After giving an abstract of Doheny's testimony, appellee adds: "This testimony was very promptly followed by the joint resolution of both houses approved February 8, 1924, which, as we have noted before, specifically denounced the lease of Teapot Dome to the Mammoth Oil Company, and the contracts and leases of April 25 and December 11, but did not make mention or refer either to the Belridge or to the other leases held by the Pan-American."

The appellee, however, seems to have overlooked the circumstance that the Senate had passed the resolution before hearing the testimony of Doheny outlined above.

Appellee makes copious references to the record in support of its statement that: "There was not a single important document or evidentiary circumstance upon which appellant relies that was not before Congress, perhaps not in the detail as presented to the district court, but that is neither to be expected, nor is it necessary."

In answer to all of this, it may simply be said that in those early days of congressional investigation the lawmakers had mere *suspicions,* whereas to-day, in view of certain recent adjudications, we have *certitude.* It was not until April 6, 1931, that Fall's conviction for bribery was affirmed by the Court of Appeals of the District of Columbia. 49 F. (2d) 506. It was only in 1927 that the Supreme Court affirmed the first Pan-American and the Mammoth Cases. As we have seen, the innocence of the Fall-Doheny transaction was stoutly maintained by counsel in the first Pan-American Case.

The appellee contends that "to say that with all its investigation the committee did not reach a definite idea as to the E, G or I, F, H or D, or the Belridge leases and, therefore, was unwilling either to direct or not direct proceedings against them, is simply an indictment of the efficiency of the committee," etc.

This is a patent non sequitur. To say that Congress was not ready to pass upon the validity of these three leases with the evidence it then had before it is merely to say that it was not willing to arrogate unto itself the powers of a court, to settle a controversy that, after seven years of litigation, is not yet entirely res adjudicata.

Congress noticed certain gigantic leases that bore the earmarks of fraud. It directed immediate action upon those, and refrained from expressing itself regarding others as to which the fraud was not so apparent. The resolution itself so indicates. Failure to act with respect to these smaller leases merely indicates that Congress did not claim for itself omniscience regarding a tangled skein which it has taken years to unravel.

We come finally to the defense of split cause of action.

At the threshold of our inquiry, it must be noted that the rule is not iron-bound, especially in equity cases: "The rule against splitting causes of action is not altogether one of original legal right, but is rather one of interposition based upon principles of public policy and of equity to prevent the inconvenience and hardship incident to repeated and unnecessary litigation. * * * In equity the enforcement of the rule is not so strict as in actions at law, and even at law it will not be extended to cases not clearly within its application." 1 C. J. § 278, pp. 1107 and 1108.

Even were it conceded, however, that the rule should be applied with equal strictness in equity cases, there would still have to be considered the word of caution found in the opinion in the first Pan-American Case, supra: "The general principles of equity are applicable in a suit by the United States to secure the cancellation of a conveyance or the rescission of a contract. [Cases cited.] But they will not be applied to frustrate the purpose of its laws or to thwart public policy."

The appellee, however, repeatedly asserts that in this suit the government is acting "in its proprietary capacity," and is therefore "subject to the same rules as a private suitor."

We believe that in this respect the appellee is laboring under a misapprehension. In the first Pan-American Case, supra, the Supreme Court clearly indicated that, in litigation of this character, the government appears in its sovereign as well as in its proprietary character: "The United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created."

When we consider this language in connection with the admonition, quoted above, that the general principles of equity will not be applied to thwart public policy, we must realize that the rule against splitting a cause of action is to be interpreted with great liberality in favor of the sovereign.

Care should be taken to distinguish between "transaction" and "cause of action." In the instant case, the evidentiary transaction that has given rise to the government's right to redress is, indeed, identical with the evidentiary transaction that tainted the leases involved in the first Pan-American Case; namely, the Fall-Doheny fraud.

But the same transaction may give rise to more than one cause of action: " 'Transaction' is defined by Worcester as 'the act of transacting or conducting any business; negotiation; management; a proceeding.' We must recur to the definition of cause of action already given. It includes the plaintiff's primary right which has been invaded, and the wrongful act or default—the delict—of the defendant by which the right is broken. In order that causes of action may arise out of a transaction, there must therefore be a negotiation, or a proceeding, or a conduct of business, between the parties, of such a nature that it produces, as necessary results, two or more different primary rights in favor of the plaintiff, and wrongs done by the defendant which are violations of such rights. The proceeding, or negotiation, or conduct of business, must of course, be a unit, one affair, or else it would not be a single transaction; and yet it must be in its nature complex, for it must be the origin of two or more separate primary rights, and of the wrongs which violate them. In order that this may be so, the facts from which the different primary rights flow *must be parts of, or steps in, the transaction;* and, for the same reason, the wrongful acts or omissions of the defendant must be parts of the same transaction. If a single transaction—that is, a single, continuous, and complex proceeding, or negotiation, between the parties—is analyzed and reduced into its series of acts and defaults,

and some of these acts are the facts from which spring[s] one primary right in favor of the plaintiff, and other acts are the facts from which spring[s] a different primary right in his favor, and others still are the violations or breaches of these rights, these two causes of action do truly arise out of the same transaction." Pomeroy's Code Remedies (5th Ed.) § 367.

Elsewhere in the same eminent text we find the principle elucidated: "If two separate and distinct primary rights could be invaded by one and the same wrong, or if the single primary right should be invaded by two distinct and separate legal wrongs, in either case two causes of action would result; a fortiori must this be so when the two primary rights are each broken by a separate and distinct wrong." Section 350.

■■■ So in the instant case. The government had the primary right to have each of its contracts authorized, executed, or approved for lawful purposes and by honest and faithful representatives. Each time that an oil lease was given for an unlawful purpose by one whom, as we have seen, the highest court in our land has characterized as a "faithless public officer," a separate and distinct primary right of the government was violated.

Furthermore, it is to be noted that the congressional mandate to the special counsel, through the President, did not include suits to cancel the instant leases. That mandate, as we have seen, clearly specified "the said leases and contract and all contracts incidental or supplemental thereto," and "such other actions or proceeding, civil and criminal, as may be warranted by the facts in relation to the making of the said leases and contract."

The appellee partly admits that the instant leases are not included in the congressional mandate: "It is to be noticed that the E, G, and I leases are certainly not supplemental to the leases or contract of April 25th and December 11th. They could be said to be incidental to those contracts only upon appellant's present theory that they were conceived at the inception of the conspiracy and executed as steps toward its consummation and to furnish additional royalty oil to pay for the construction at Pearl Harbor."

This qualification insisted upon by the appellee is due to the fact that it confuses leases *incidental to the fraud* with leases *incidental to one another*. It is to be freely

conceded that all the leases involved in the present case and in the first Pan-American suit were incidental to the fraud of Fall and Doheny. The government not only admits this, but insists upon it.

This does not mean, however, that the leases involved in the present suit are incidental or supplemental to those set forth in the first Pan-American Case.

This confusion in the appellee's reasoning is apparent elsewhere in its brief. Thus, on pages 496–497, it says: "To illustrate: The E, G and I leases were either entirely untainted by fraud, in which case they must be upheld, or they were tainted by the fraud upon which the Government has already sued and been granted relief, and their cancellation was a part of the one cause of action."

Again, on pages 497, 498: "The appellant, in endeavoring to explain why the E, G and I leases were omitted from the first suit, insists that the direction of Congress for the institution of that suit clearly withheld authority to include the E, G and I, or the F, H and D leases in that suit. In other words, that Congress said to the President that he should employ special counsel to sue for a cancellation of the leases specified in the resolution and all contracts and leases incidental and supplemental thereto, but he should not include therein the E, G and I, F, H and D leases. This, of course, could only be upon the assumption that Congress either did not regard the E, G and I, F, H and D leases *as incidental or supplemental to the fraud or conspiracy*, or if so, that their connection therewith was so slight and their benefit to the Government so great that Congress did not desire them to be cancelled and wished their enforcement." (Italics our own.)

We have quoted at such length from the appellee's brief in order to make clear what we conceive is the appellee's fundamental misapprehension as to the relation of the instant leases to those involved in the first suit, as contradistinguished from their relation to the common fraud.

■ It is self-evident that, if the plaintiff is not authorized to join two or more causes of action, he cannot later be met with the defense that he split such causes of action: "If, at the time of the commencement of an action to recover upon a severable part of a claim, then capable of recovery in such action, another severable part of such claim is incapable of recovery in that particular action, such other separate and severable right of action (even though both arise out

■■■■

of the same contract) may be made the subject of a separate action without offending against the rule prohibiting the splitting of causes of action. [Cases cited.]" Brooks v. Yarbrough et al. (C. C. A. 10) 37 F.(2d) 527, 530. See, also, Fellows v. National Can Co. (D. C.) 13 F.(2d) 210, 211.

Nor does it matter that the same evidence as to the Fall-Doheny fraud must be relied upon in the present suit as was depended upon in the first Pan-American Case. The fraud and conspiracy are not the cause of action. They are merely evidentiary matters relied upon to establish the fact that certain leases, negotiated, authorized, executed, and approved independently of each other, were tainted with a corruption that was common to all. Each corrupt lease constitutes a separate and distinct cause of action, though suffering from the same taint.

 Authorities are numerous on the proposition that, in a civil case of this nature, the abstract fraud and conspiracy are not the cause of action, but rather the overt acts done in furtherance of the fraudulent plan.

In 12 Corpus Juris, § 100, pp. 581, 582, we find the following statement of the principle: "For obvious reasons, however, civil liability rests on different grounds, and unless something is actually done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, which act results in damage, no civil action lies against any one. The gist of the action is the damage and not the conspiracy, and the damage must appear to have been the natural and proximate consequence of defendant's act."

Again, in section 104, pp. 584, 585: "As a general rule averment and proof that the acts were done in pursuance of a conspiracy do not change the nature of the action or add anything to its legal force and effect. If a plaintiff fails in the proof of a conspiracy or concerted design, he may yet recover damages against one or more of defendants shown to be guilty of the tort without such agreement. The charge of conspiracy where unsupported by evidence will be considered mere surplusage not necessary to be proved to support the action."

In Adler et al. v. Fenton et al., 24 How. (65 U. S.) 407, 410, 16 L. Ed. 696, the court said: "To enable the plaintiffs to sustain an action on the case like the present, it must be shown that the defendants have done some wrong, that is, have violated some right of theirs, and that damage has resulted as a direct and proximate consequence from the commission of that wrong. The action cannot be sustained, because there has been a conspiracy or combination to do injurious acts. In Savile v. Roberts, 1 Lord R., 374, Lord Holt said, 'it was objected at the bar against these old cases, that they were grounded upon a conspiracy, which is of an odious nature, and therefore sufficient ground for an action by itself. But to this objection he answered, that conspiracy is not the ground of these actions, but the damages done to the party; for an action will not lie for the greatest conspiracy imaginable, if nothing be put in execution.'"

Similarly, in Nalle v. Oyster, 230 U. S. 165, 182, 183, 33 S. Ct. 1043, 1048, 57 L. Ed. 1439, it was held: "It is further insisted that the second count of the declaration is not, properly speaking, a count in libel, but is a count in trespass on the case for a conspiracy. But the well-settled rule is that no civil action lies for a conspiracy unless there be an overt act that results in damage to the plaintiff. To this effect are the very authorities upon which plaintiff in error relies. [Cases cited.]"

In Dennison v. Payne, Agent, etc. (C. C. A. 2) 293 F. 333, 343, the court stated: "Moreover, one suit is not a bar to another unless the 'cause of action' is the same in both. The cause of the injury upon which the right of action is founded is not the cause of action itself, but is only one element in the cause of action. Parris v. Atlanta, etc., Ry. Co., 128 Ga. 434, 57 S. E. 692."

In Marten v. Holbrook et al. (C. C. Cal.) 157 F. 716, 717, we find the following recognition of the same principle, by Judge Van Fleet: "The alleged conspiracy, therefore, does not constitute the gist or gravamen of the cause of action alleged; but it was the unlawful and unwarranted restraint of his person which worked the plaintiff injury. [Cases cited.]"

And in Murphy v. Crowley et al., 140 Cal. 141, 73 P. 820, 821, 822: "It seems to be established, therefore, by these cases, that although the main ground of the action is fraud or mistake whereby the defendant has obtained the legal title to the land in controversy, and the chief contention between the parties is with respect to the fraud or mistake alleged, yet, if the plaintiff alleges facts which show, as matter of law, that he is entitled to possession of the property * * * or that his title to the land be quieted, the action is in reality for the recovery

of real property, and is not barred except by the five-years limitation contained in section 318. The same rule has been followed in the states of Iowa, Kansas, Missouri, and Texas. [Cases cited.]" See, also, Sidney Morris & Co. v. National Ass'n of Stationers, Office Outfitters & Manufacturers et al. (two cases, C. C. A. 7) 40 F.(2d) 620, 624, 625; Howland v. Corn et al. (C. C. A. 2) 232 F. 35, 40; Dahlquist v. Mattson et al., 40 Idaho, 378, 233 P. 883, 885–887; Bowman et al. v. Wohlke et al., 166 Cal. 121, 135 P. 37, 39, 40, Ann. Cas 1915B, 1011; Harvey et al. v. Meigs et al., 17 Cal. App. 353, 119 P. 941, 945; Green v Davies et al., 182 N. Y. 499, 75 N. E. 536, 537, 3 Ann. Cas. 310; Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376, 379.

These three leases were negotiated independently for different ostensible purposes, for different tracts of land, at different times, and, in the case of the I lease, with a different original lessee. They had no connection with the leases and contracts that formed the basis of the first Pan-American suit, save that they all were tainted by the same evidentiary fraud. Each lease, as we have said, constituted a separate cause of action. Had it not been for the congressional mandate limiting the first suit to the leases and contract specified in Resolution No. 54, the government, in the first action, might have sued for the cancellation of the instant leases, but, we think, was not compelled to do so.

In 34 Corpus Juris, § 1231, p. 813, we find the rule as to the identity of causes of action stated in the following language: "Undoubtedly the subject matter involved in the two actions must be the same, for otherwise there could not be an identity of the causes of action; but the same transaction or state of facts may give rise to distinct or *successive* causes of action, and a judgment upon one will not bar a suit upon another."

Again, in section 1259, on pages 849–850, volume 34, of the same work, we find the following: "Distinct causes of action, capable of being sued on separately and *successively,* may arise from one and the same tortious act in favor of the same plaintiff, as where he is injured thereby in respect to different rights or interests, or brings one action in his personal capacity and the other in his representative capacity."

In Secor et al. v. Sturgis et al., 16 N. Y. 548, 554, the court said: "The holder of several promissory notes may maintain an action on each; a party upon whose person

or property *successive* distinct trespasses have been committed may bring a separate suit for each trespass; and all demands, of whatever nature, arising out of separate and distinct transactions, may be sued upon separately. It makes no difference that the causes of action *might* be united in a single suit; the right of the party in whose favor they exist to separate suits is not affected by that circumstance, except that in proper cases, for the prevention of vexation and oppression, the court will enforce a consolidation of the actions." (Italics our own.) See, also, page 558 of the same opinion; 34 C. J. § 1246, pp. 836–838, and Van Fleet's Former Adjudication, § 59, p. 205.

It is to be noticed that in the present litigation, .as we have said, although the suit was pending at the time the first Pan-American suit was tried, the appellee made no effort to have the two suits consolidated for trial.

We have italicized the words "successive" and "successively" in the foregoing quotations, because the appellee, in its brief refers to the various leases as "mere successive details and steps taken in carrying out this fraudulent scheme" and as "but successive steps by Fall and Doheny in the execution of their conspiracy."

Again quoting from 34 Corpus Juris, § 1236, p. 823:

"But this rule does not require a plaintiff to join in one suit several distinct and separate causes of action which he may have against the same defendant, nor does it mean that the prior judgment is conclusive of matters not in issue or adjudicated, and which were not germane to, implied in, or essentially connected with, the actual issues in the case, although they may affect the ultimate rights of the parties and might have been presented in the former action. * * *

"Where the causes of action are separate and distinct, the judgment in the first action is conclusive only as to matters actually in issue and adjudicated."

So in the instant case, as the appellee states: "The decision of the Supreme Court establishes as a fact adjudicated between the parties that all of the leases executed in consummation of the conspiracy were so interwoven that they constituted a single wrongful transaction."

But, as we have seen, several causes of action may arise out of a single transaction.

Decisions sustaining this view are numerous. In Cromwell v. County of Sac, 94 U. S.

351, 356, 24 L. Ed. 195, the court said: "Various considerations, other than the actual merits, may govern a party in bringing forward grounds of recovery or defence in one action, which may not exist in another action upon a different demand, such as the smallness of the amount or the value of the property in controversy, the difficulty of obtaining the necessary evidence, the expense of the litigation, and his own situation at the time. A party acting upon considerations like these ought not to be precluded from contesting in a subsequent action other demands arising out of the same transaction."

That case was quoted with approval in Nesbitt v. Riverside Independent District, 144 U. S. 610, 619, 620, 12 S. Ct. 746, 748, 36 L. Ed. 562, in which the court further said: "Each matured coupon is a separable promise, and gives rise to a separate cause of action. It may be detached from the bond and sold by itself. Indeed, the title to several matured coupons of the same bond may be in as many different persons, and upon each a distinct and separate action be maintained. So, while the promises of the bond and of the coupons in the first instance are upon the same paper, and the coupons are for interest due upon the bond, yet the promise to pay the coupon is as distinct from that to pay the bond as though the two promises were placed in different instruments, upon different paper."

Again, in Dennison v. United States, 168 U. S. 241, 249, 18 S. Ct. 57, 60, 42 L. Ed. 453, the Supreme Court quoted Cromwell v. Sac County with approval, saying: "Further than this, however, the suit under consideration is not for the *same* items as those allowed in the former case, but for *similar* items, and the case falls within our ruling in Cromwell v. Sac County, 94 U. S. 351 [24 L. Ed. 195], that 'where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' There was no issue raised and decided in the former case as to the legality of the several items considered separately, but such issue is clearly raised in this case."

Emphasizing the fact that, as here, the negotiations were separate and independent, the Circuit Court of Appeals for the Second Circuit used the following language in Bates v. United Shoe Machinery Co., 216 F. 140, 142: "Finally, there is the question of splitting the causes of action. This rule is a salutary one, as it tends to minimize litigation, but it is not capable of absolute and nice definition. Generally the courts have said that the incident must follow along with the thing, and that one cause of action should not be divided. 'Cause of action' is a vague phrase, but we think that these two wrongs are separate enough not to constitute a single cause of action. As we have suggested, the wrongs were in failing to register Odell as stockholder upon two separate blocks of stock. His demand was made in respect of one in October, 1900, and the wrong consisted in failing to recognize him as soon as his title was clear. His demand in respect of the other was made in April, 1901, six months later. It concerned a separate block of stock purchased by subscription, not by transfer, and the result of a wholly different transaction. It is quite true that the right to the second block was derivative from the first, but it was not a mere incident to it, like a dividend. *To get one's rights to the new stock one had to make a new and distinct bargain;* the only connection between the two was that only the owners of the first block had the option to buy the new. While these two transactions *might* have been joined, we think that they need not have been." (Italics our own.)

So in the instant case. As we have seen in our statement of facts, the "bargaining" for the various leases, E, G, and I, was diverse and distinct, though the same fraud runs through them all.

In Nathans v. Hope, 77 N. Y. 420, 421, the court said:

"The principle is well settled that an entire indivisible demand cannot be split up into several claims, so as to make it the subject of two or more separate actions (Secor v. Sturgis, 16 N. Y. 554). * * *

"But this rule does not interfere with the prosecution of separate suits for distinct causes of action, which are not connected with each other and do not constitute an entire claim. Hence it follows that there is no rule of law or principle which prevents the prosecution of several promissory notes in separate and distinct actions, and the holder may maintain an action separately on each note. The same rule applies to separate trespasses. A separate suit may be brought for each one of them; and all demands which arise upon a separate and distinct transaction may be prosecuted separately. (See case last cited.) Where separate actions are brought

upon several promissory notes, the party bringing the same runs the risk of an order consolidating all of them into one single action; but a recovery in one is not a bar to any other."

See, also, Ginsburg v. McBride (four cases) 248 Mich. 221, 226 N. W. 873, 874, in which Nathans v. Hope, supra, is cited with approval; Lozier Automobile Exch. v. Interstate Casualty Co., 197 Iowa, 935, 195 N. W. 885, 888; Candrian v. Miller, 98 Wis. 164, 73 N. W. 1004, 1005.

It has been held that the proper test as to the identity of causes of action is to inquire whether the same evidence that is necessary to maintain the second action would have been sufficient to support the first.

Applying this test to the instant case, we find proof of the three leases sued upon in the present action would not have been sufficient to sustain the judgment in the first case, which involved different leases and contracts.

Furthermore, as the appellant points out, the appellee might have asserted certain defenses in this suit, had the facts warranted them, such as that Fall had nothing to do with the making of these leases and no duty with respect to them, and such as that these leases might have been ratified by Congress. The government, however, happens to have established the fact that Fall *did* have something to do with each of these three leases, and therefore, as a matter of fact and of law, the adjudicated fraud and conspiracy attach to each of them.

The rule as to identity of evidence as the test is thus stated in 34 C. J. § 1226, pp. 805, 806: "The test most commonly stated is to ascertain whether the same evidence which is necessary to sustain the second action would have been sufficient to authorize a recovery in the first; if so the prior judgment is a bar; otherwise it is not. But if the evidence offered in the second suit is sufficient to authorize a recovery, but could not have produced a different result in the first suit, the failure of the plaintiff in the first suit is no bar to his recovery in the other suit, although it is for the same cause of action."

In Stark v. Starr, 94 U. S. 477, 485, 486, 24 L. Ed. 276, Mr. Justice Field said: "But this principle does not require distinct causes of action,—that is to say, distinct matters, —each of which would authorize by itself independent relief, to be presented in a single suit, though they exist at the same time and might be considered together. The agreement between Stark and the parties through whom the complainants claimed constituted a cause for relief, distinct from and independent of that arising from the interest asserted by them as beneficiaries under the patent to the city authorities. There was, therefore, no rule of law which compelled the presentation of the two causes of relief in the same suit. They required different allegations in the bill, and different evidence on the hearing. The court might have considered one cause insufficient, and sustained the bill on the other."

The test was thus stated by Judge Choate in Emma Silver Mining Co., Limited, v. Emma Silver Mining Co. of New York et al. (C. C. N. Y.) 7 F. 401, 409: "If however, there is a fact which must have been established in the former suit, to authorize the verdict and judgment, which the complainant is not obliged to prove to entitle it to a decree avoiding the sale in this suit, or if such decree may, in this suit, pass upon proof of any of the allegations of the bill not necessarily determined against the complainant in the former suit, then the judgment is no bar, and those pleas must fail. A careful comparison of the former complaint and the present bill shows that there is a fact which the plaintiff in the former suit was obliged to prove in order to recover, which is not necessary to be proved in the present suit to entitle the complainant to a decree of rescission, and that there are facts alleged as the ground for relief in the bill not necessarily determined adversely to the complainant in the former suit."

The appellee asserts that the claim "that these leases were also included in the conspiracy * * * was a fact not presented by the pleadings and not necessary to the decision of the court in the first suit."

That being so, "different evidence" was "required" in the two suits, and therefore, under the foregoing decisions, the causes of action are not identical.

We turn, finally to an examination of some of the leading authorities for the proposition that suits involving different tracts of land are not suits for the same things.

Emphasis upon the necessity for identity in the lands sued upon before it can be claimed that two actions are for the same thing was laid by the Supreme Court in Roberts v. Northern Pacific Railroad Co., 158 U. S. 1, 27, 15 S. Ct. 756, 764, 39 L. Ed. 873: "It is apparent, therefore, that the question or point actually litigated in the state court was not the same with those before the federal court; and hence, as the causes of ac-

tion in the two courts were not the same, the judgment in the state court, while it might determine the controversy between the parties to it as respects the pieces of land there in question, could not be conclusive in another action upon a different claim or demand."

Judge Gilbert of this court adverted to the same principle in Southern Oregon Co. v. United States, 241 F. 16, 23, 24; remanded for modification in conformance with statute passed after judgment had been handed down, 249 U. S. 589, 39 S. Ct. 387, 63 L. Ed. 791: "In none of those cases did the government seek to establish title to any of the lands herein involved, or to compel the observance of the covenants contained in the grant. The most that can be said for the prior suits is that in some of them the questions which are here involved might have arisen and might have been litigated. But the purpose of those suits was different from the purpose of the present suit, and the causes of action were different. The present suit was brought to enforce the law of the grant, and the covenant of the grantee, and the prior suits operated as an estoppel only to the points or questions actually litigated and determined therein. Nesbitt v. Riverside Independent District, 144 U. S. 610, 12 S. Ct. 746, 36 L. Ed. 562."

The Circuit Court of Appeals for the Fourth Circuit has laid down the same doctrine: "We are also of opinion that the dismissal of plaintiffs' bill cannot be sustained by the pendency of a similar suit, previously brought, in the state of Virginia. Treating that suit as though begun in the federal court to which it has been removed, and granting, as defendant argues, that federal courts of different districts are not foreign to each other, the conclusive answer to his contention nevertheless is that the subject-matter of the two suits is not the same. True, both of them seek to set aside the same release and to enforce the same judgment; but the lands sought to be charged in one case are in Virginia, while in the other the lands sought to be charged are in West Virginia. * * * Such suits have the same parties, to be sure, and are based on the same judgment; but they differ in subject-matter because each is concerned with a separate piece of property." Ross et al. v. Miller, 252 F. 697, 700. See, also, Fessenden v. Barrett et al. (C. C.) 50 F. 690, 692; Miller & Lux, Inc., et al. v. James et al., 180 Cal. 38, 179 P. 174, 177; Brill v. Shively et al., 93 Cal. 674, 29 P. 324, 325; Gedney v. Gedney et al., 160 N. Y. 471, 55 N. E. 1.

To recapitulate, then, regarding the defense of split cause of action, we find that it is not tenable in the instant case, for the following reasons:

(1) The rule, which is not iron-bound, should be particularly relaxed in equity cases, where the sovereign is seeking, in the words of the Supreme Court, "to vindicate the policy of the Government."

(2) Each lease represented a separate and distinct violation of the government's primary right to have its contracts made by a public officer who was not "faithless."

(3) Because of the congressional mandate limiting the first action to the leases specified in Resolution No. 54, the special counsel therein referred to were not authorized to include the instant leases in the first suit. The rule as to splitting causes applies only to claims "then capable of recovery" in the first action.

(4) Though tainted by the same common fraud, each lease was negotiated independently, for different ostensible purposes, for different parcels of land at different times, and, in the case of the I lease, with a different original lessee. Not the common fraud, but the "separate and successive" wrong suffered by the government when each lease was executed, was the basis of both the first and the second suits. The Fall-Doheny fraud and conspiracy constituted a wrongful transaction, from which more than one cause of action might flow.

(5) In such a situation, had it not been for the limiting provisions of Resolution No. 54, the government might have been permitted, but could not be prejudiced by failure, to join the various causes of action.

(6) Generally speaking, independent contracts give rise to separate and distinct causes of action.

(7) This rule as to contracts is applicable to those dealing with separate and distinct tracts of land.

Although the appellee does not stress the point in its brief, it contends in its answer to the amended bill of complaint "that the plaintiff has neither paid nor tendered to this defendant the sums of money and the quitclaim deeds and other documents which this defendant was and is justly and equitably entitled to by reason of the matters and things herein set forth; that the plaintiff

has not by its bill of complaint herein offered to do equity in the premises; and that the said bill of complaint is without equity."

We hold that there is no merit to this contention, on the authority of the Supreme Court in the first Pan-American Case, supra, 273 U. S. at pages 503–510, 47 S. Ct. 416, 71 L. Ed. 734, and in the Mammoth Oil Case, supra, 275 U. S. at page 55, 48 S. Ct. 1, 72 L. Ed. 137. Likewise, we hold that the plea of estoppel is without merit.

We think that the lower court should have entered a decree in favor of the appellant. We therefore reverse the case, with instructions to the court below to enter a decree in accordance with the prayer of the amended bill of complaint.

Decree reversed, with instructions.